*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

BETTY HOLMES,

        Plaintiff/Counterdefendant-Appellant,

v

ARINGTOR HICKS and MASTERPIECE, INC.,

        Defendants/Counterplaintiffs-
        Appellees,

and

ARLINGTON HICKS,

        Defendant/Counterplaintiff.

UNPUBLISHED
April 30, 2020

No. 346065
Saginaw Circuit Court
LC No. 16-029869-CB

Before: BORRELLO, P.J., and O'BRIEN and CAMERON, JJ.

PER CURIAM.

Plaintiff/counterdefendant, Betty Holmes, appeals by right a judgment awarding her $11,807.21 following a jury trial. After trial, the trial court denied Holmes's claims for equitable relief. For the reasons set forth in this opinion, we affirm.

## I. BACKGROUND

This case arises out of a dispute between Holmes and Aringtor Hicks[1] over the ownership of a parcel of commercial real property and the nature of any agreement they may have reached between themselves.

Holmes testified that she owns Heavenly Realm Adult Foster Care, which consists of multiple adult foster care facilities in Saginaw. Hicks owns Masterpiece, Inc., which he

---

[1] Aringtor Hicks is also known as Arlington Hicks.

-1-

characterized as "basically a property management company." Hicks met with Holmes for lunch at some point after their class reunion in the summer of 2015. According to Holmes, Hicks set up the meeting because he wanted to discuss the adult foster care business in Saginaw, and he told her that he operated adult respite facilities in Detroit. Hicks's trial testimony, although somewhat vague and unclear, suggested that he told Holmes he was looking for properties in Saginaw for purposes of opening a semi-independent living or respite services facility. Hicks testified that he and Holmes met again after the initial lunch meeting to look at properties together.

With respect to the property that is the subject of this dispute, Holmes testified that she discovered the property was for sale while driving near one of her other facilities and that she eventually made an offer, which was accepted, to purchase the property for $40,000. The listing realtor then told Holmes that the property had to be sold at public auction due to bankruptcy proceedings. Holmes's testimony reflects that she paid at least $12,000 from her business account toward the purchase price of the property, including a $10,000 down payment that Holmes was told was necessary to secure a right to place the first bid on the property. When Hicks returned to Saginaw, Holmes gave him a tour of all of her facilities, told him about the subject property that she was purchasing, and showed him the subject property. When Holmes told Hicks how much she was going to pay for the property, he offered to loan her the money but she declined. According to Holmes, Hicks began contacting her "constantly" from this point forward but there were never any plans to go into business together.

Holmes testified she later contacted Hicks to tell him she had been the only person to bid on the property and to ask him if he still wanted to loan her the money. He responded that he would loan her $30,000, and Holmes agreed to accept the loan. Hicks subsequently informed Holmes that he could only loan her $25,000, and she then agreed to this arrangement. Holmes testified that Hicks gave her a cashier's check for $25,000 before the closing and that when she asked him about the terms for repayment, he told her that they could "come up with something."

Holmes closed on the property and received a deed conveying the property to her. According to Holmes, neither Masterpiece nor Hicks were involved in the closing. Holmes testified that shortly after the closing, Hicks began contacting her and telling her "he needed to show where his money was."[2] Holmes further testified when she asked Hicks if he wanted her to repay the money immediately, he said that he did not want her money now and that he wanted her to give him a deed conveying the property to him in exchange for a land contract from him providing for her repayment of the $25,000 to him. When Holmes proposed giving him a promissory note, Hicks indicated that he did not want a promissory note. Holmes testified that Hicks was only interested in obtaining a deed conveying the property to him. The terms of the land contract apparently would have required Holmes to repay $32,000 at 6% interest, although Holmes testified that she believed at the time that the repayment amount was erroneous.

Holmes and Hicks went to the register of deeds, but they were unable to record the land contract because the title company had not yet paid the taxes from the recent sale to Holmes.

---

[2] Although the exact meaning of this statement is difficult to discern, it appears from the context of Holmes's testimony that she understood Hicks to be referring to the manner of acknowledging the $25,000 debt that she owed him.

According to Holmes, when she and Hicks parted ways after leaving the register of deeds, Hicks apparently had both the land contract and the quitclaim deed that Holmes had signed conveying the property to Masterpiece. Hicks would not answer Holmes's calls later that day, so Holmes recorded a different quitclaim deed the next day that conveyed the property to both Holmes and Masterpiece. Later the same day, Hicks apparently recorded the quitclaim deed he previously obtained from Holmes which conveyed the property solely to Masterpiece.

In contrast to the version of events related at trial by Holmes, Hicks claimed to have arranged a deal with Holmes whereby she would essentially act as a straw buyer for him. Hicks testified that he and Holmes had been planning on going into business together, with each of their companies owning a respite services facility in Saginaw. Specifically, Hicks testified he was planning to purchase the subject property for this purpose, while Holmes already owned another property to be used for this purpose. According to Hicks, he toured the subject property with Holmes and told her that he was going to put in an offer to purchase the property for Masterpiece, but Holmes convinced him to let her put in a lower offer herself because she thought that the listing realtor liked her.

Miranda Morrow, a realtor who worked with Hicks on prior real estate transactions, testified she began putting together an offer on Hicks's behalf to buy the subject property but complications arose regarding obtaining financing and Hicks told her Holmes was going to purchase the subject property on his behalf. According to Morrow, she understood the agreement to be that Hicks would own the property and Holmes would manage the operations of the facility.

Hicks testified he gave Holmes all of the money she used to purchase the subject property—i.e., $40,000—and that Holmes did not use any of her own money in purchasing the property. Hicks explained he gave Holmes the money in installments rather than in a lump sum. According to Hicks, Holmes was to convey the property to Hicks or Masterpiece after the closing but she never did. Hicks believed Holmes did not want to convey the property to him and appeared to want to keep the property for herself.

Hicks's testimony reflects that the parties' business relationship apparently deteriorated, and they began discussing a plan for Holmes to keep the subject property and pay back the money she owed Hicks through a land contract. Hicks testified he asked Holmes to return his money instead, but she did not have sufficient funds available. He further testified the land contract was Holmes's idea. Hicks claimed after he and Holmes visited the register of deeds together, he left with the quitclaim deed conveying the property to Masterpiece and Holmes left with the unexecuted land contract. Hicks testified the land contract terms involved Holmes making an $8,000 down payment, repaying his $2,000 in earnest money that he had provided to her, and repaying $32,000 with interest. Hicks stated Holmes had not given him any money at that point and he communicated to her he would execute the land contract if she tendered the down payment. When Holmes indicated she had the money, Hicks told her he wanted all of the money and did not want to execute a land contract.

The jury returned a verdict finding there was no contract between Holmes and any defendant, that no defendant made a representation of material fact to Holmes, that no defendant made a representation in connection with making a contract with Holmes, that no defendant made

a promise to Holmes that was clear and definite, and that Masterpiece was unjustly enriched by unfairly receiving and retaining a benefit from Holmes in the amount of $11,267.13.

Although the trial court previously indicated Holmes's concurrent claims for equitable relief would be addressed after the jury trial concluded, Holmes failed to pursue her equitable claims or otherwise act related to the entry of a judgment. After approximately five months from the date of the verdict, the trial court sua sponte set the matter for a show cause hearing "to prompt action one way or the other." At that hearing, Holmes requested the trial court rule on her various equitable claims before entering a money judgment, prompting the trial court to adjourn the matter to allow defendants an opportunity to respond to Holmes's arguments.

The parties reconvened for another hearing, at which Holmes conceded she did not have any further proofs to present on the matter, and that the court had all of the evidence before it necessary to address her equitable claims. The trial court denied Holmes's request for equitable relief and entered a judgment in accordance with the jury's verdict which awarded Holmes $11,807.21.[3] When so ruling, trial court stated Holmes had "arguably" elected to pursue only her legal remedies to the exclusion of her equitable remedies by her lack of diligent action regarding her equitable claims. However, the trial court also explicitly stated even if there had been no election to pursue only legal remedies, it was declining to exercise its discretion to grant any form of equitable relief because it had not been persuaded exercising its equitable jurisdiction was warranted. The trial court also denied Holmes's motion for reconsideration in a written opinion and order, noting that it sat through the trial and that the evidence did not support granting equitable relief to Holmes. The trial court further confirmed in its written opinion and order it had not denied Holmes an opportunity to elect her remedies but rather determined she was not entitled to an equitable remedy.

This appeal followed, in which Holmes challenges the trial court's posttrial ruling denying her equitable relief.

## II. STANDARD OF REVIEW

Causes of action sounding in equity are reviewed "de novo on the record on appeal." *Tkachik v Mandeville*, 487 Mich 38, 44-45; 790 NW2d 260 (2010). "[T]he granting of equitable relief is ordinarily a matter of grace, and whether a court of equity will exercise its jurisdiction, and the propriety of affording equitable relief, rests in the sound discretion of the court, to be exercised according to the circumstances and exigencies of each particular case." *Tkachik*, 487 Mich at 45, quoting *Youngs v West*, 317 Mich 538, 545; 27 NW2d 88 (1947) (quotation marks omitted; alteration in original). "Of course, this discretion is not an arbitrary one, but must be exercised in accordance with the fixed principles and precedents of equity jurisprudence, and in accordance with the evidence." *Youngs*, 317 Mich at 545 (quotation marks and citation omitted).

## III. ANALYSIS

---

[3] This amount included the jury's damages award, plus certain costs and fees.

Holmes first argues that the trial court's decision was erroneous because her equitable claims were not barred by the fact that the jury had returned a verdict awarding her monetary damages and because her equitable claims were not barred by the doctrine of election of remedies. This argument does not lead us to conclude Holmes is entitled to relief because this argument is founded on a fundamental mischaracterization of the basis for the trial court's ruling.

We concur with Holmes's argument, as set forth by this Court in *Zurcher v Herveat*, 238 Mich App 267, 297-298; 605 NW2d 329 (1999), that when a plaintiff seeks both legal and equitable relief, the plaintiff is not deprived of the right to a ruling by the trial court on the equitable claims:

> The parties have a constitutional right in Michigan to have equity claims heard by a judge sitting as a chancellor in equity. If a plaintiff seeks only equitable relief, he has no right to a trial by jury. However, in this case, the plaintiff sought both equitable relief in the form of specific performance and legal relief in the form of damages. In this situation the plaintiff had a right to have a jury hear his damage claim. [*Id*. at 297 (quotation marks and citation omitted).]

Additionally, regarding the doctrine of election of remedies, the doctrine is generally considered to be "a procedural rule which precludes one to whom there are available two inconsistent remedies from pursuing both." *Riverview Co-op, Inc v First Nat'l Bank & Trust Co of Mich*, 417 Mich 307, 311; 337 NW2d 225 (1983). "Its purpose is not to prevent recourse to alternate remedies, but to prevent double redress for a single injury." *Id*. at 312. "In order that the election of remedies doctrine apply in any context, three prerequisites must be met." *Id*. "[T]he essential conditions or elements of election of remedies are: (1) The existence of two or more remedies; (2) the inconsistency between such remedies; and (3) a choice of one of them." *Id*. at 313 (quotation marks and citation omitted; emphasis omitted); see also *Barclae v Zarb*, 300 Mich App 455, 486; 834 NW2d 100 (2013).

In this case, the trial court's decision to deny Holmes's request for equitable relief was not based on a view that her equitable claims were barred by either her pursuit of legal remedies at the trial or the doctrine of election of remedies. Although the trial court discussed how Holmes's lack of action in diligently pursuing her equitable claims appeared to demonstrate a choice to pursue legal remedies instead of equitable ones, the court unequivocally rested its final decision on its determination that equitable relief was not justified under the factual circumstances of the case. From its rulings it is clear that the trial court clearly understood Holmes's right to pursue both legal and equitable claims and the trial court retained the discretion to exercise its equitable jurisdiction to grant equitable relief as appropriate. The trial court specifically addressed Holmes's equitable claims by determining that equity was not warranted. Thus, contrary to Holmes's assertions on appeal, the trial court ruled on Holmes's equitable claims and it did not rely on the application of the doctrine of election of remedies as a basis for denying her equitable claims.

Next, Holmes argues that the trial court's ruling was erroneous because she was entitled to equitable relief.

"[E]very equitable right or interest derives not from a declaration of substantive law, but from the broad and flexible jurisdiction of courts of equity to afford remedial relief, where justice

and good conscience so dictate. Equity allows complete justice to be done in a case by adapt[ing] its judgment[s] to the special circumstances of the case." *Tkachik*, 487 Mich at 46 (quotation marks and citations omitted; second and third alterations in original). In this case, although plaintiff presented herself as an innocent party who was taken advantage of by Hicks, she was not. Review of the record reveals the existence of conflicting evidence that Hicks provided all of the money used to purchase the subject property so that Holmes could act as his straw buyer. There was also testimony indicating Holmes then attempted to secure an agreement to allow her to own the property. The trial court noted it sat through the entire trial and the evidence did not support Holmes being entitled to equitable relief. Given the conflicting testimony in this matter and the basis provided by the trial court for its ruling denying equitable relief, we cannot find that the trial court's decision constituted an abuse of discretion. The circumstances of this case, and good conscience, do not suggest that equity was warranted to allow complete justice to be done. *Id*.

Furthermore, the trial court also duly noted Holmes's months of inaction with respect to pursuing her equitable claims following the jury trial. "[E]quity will not assist a [person] whose condition is attributable only to that want of diligence which may be fairly expected from a reasonable person." *Id*. at 55 (quotation marks and citation omitted; second alteration in original). A reasonable person who believed that an equitable remedy with respect to the property dispute at issue was truly preferable to the money judgment awarded by the jury would have affirmatively and diligently pursued such an equitable remedy instead of waiting almost five months for the trial court to prompt such action. Thus, Holmes's lack of action regarding her equitable claims following the trial further supports the trial court's decision. "[A] complainant in equity must come to the court with a clean conscience, in good faith, and after acting with reasonable diligence: Nothing can call forth this court into activity but conscience, good faith and reasonable diligence; where these are wanting the court is passive, and does nothing." *Knight v Northpointe Bank*, 300 Mich App 109, 114; 832 NW2d 439, 442 (2013) (quotation marks and citation omitted).

Affirmed. No costs are awarded. MCR 7.219(A).

/s/ Stephen L. Borrello
/s/ Colleen A. O'Brien
/s/ Thomas C. Cameron